**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE NATIONAL SPIRITUAL ASSEMBLY OF THE BAHA'IS OF THE UNITED STATES OF AMERICAN UNDER THE HEREDITARY GUARDIANSHIP, INC.,<br><br>Counter-Defendant,<br><br>v.<br><br>NATIONAL SPIRITUAL ASSEMBLY OF THE BAHA'IS OF THE UNITED STATES OF AMERICA, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 64 CV 1878 |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

Currently before the Court is the question of whether the National Spiritual Assembly of the Baha'is of the United States (the "NSA") has established that certain non-party individuals and entities – (1) Franklin D. Schlatter, (2) Joel B. Marangella, (3) the Provisional National Baha'i Council ("PNBC"), (4) the Second International Baha'i Council (d/b/a Baha'is Under the Provisions of the Covenant) ("SIBC"), and (5) the Baha'i Publishers Under the Provisions of the Covenant ("BPUPC") (collectively, the "Alleged Contemnors") – should be held in contempt for violating a permanent injunction judgment entered in this matter on June 28, 1966.  (R. 1-1, NSA's Motion for Rule to Show Cause at 1.)  After granting the parties the opportunity to conduct discovery, (R. 26-1, Order of Feb. 2, 2007; R. 42-1, Order of Mar. 22, 2007), and after concluding that material issues of fact precluded summary disposition, (R. 61-1, Order of Aug. 8, 2007; R. 64-1, Order of Aug. 16, 2007 (clarifying the holding of the Order of August 8, 2007)),

-1-

the Court held an evidentiary hearing to determine whether the Alleged Contemnors are in privity with the party originally bound by the injunction. Based on the evidence adduced at that hearing and the parties' written submissions, the Court finds, for the reasons below, that none of the Alleged Contemnors is in contempt.

## BACKGROUND

### I. Procedural Posture

On November 3, 2006, the NSA filed a motion for rule to show cause why the Alleged Contemnors should not be held in civil contempt for violating a preliminary injunction judgment entered on June 28, 1966. (R. 1-1, NSA's Motion for Rule to Show Cause.) The underlying case involved two parties: (1) The National Spiritual Assembly of the Baha'is of the United States Under the Hereditary Guardianship, Inc. (the "NSA-UHG" or "UHG"), as plaintiff to the action, and (2) the NSA, as defendant. (*Id.*, Ex. A at 1.) The judgment resolved the NSA's counterclaim against the NSA-UHG, "a counterclaim based upon asserted unfair competition, trademark infringement, dilution of the distinctive quality of [NSA's] trademarks and trade names, and likelihood of injury to the business reputation of [the NSA]." (*Id.*, Ex. A at 1-2 (further noting that the Court had dismissed the NSA-UHG's complaint); R. 88-1, NSA Proposed Findings at ¶26 (noting that the NSA-UHG filed the original complaint in the case against the NSA, claiming to represent the true Baha'i Faith, and further claiming ownership of the Baha'i House of Worship in Wilmette, Illinois and all other Baha'i funds, properties and bequests).) In 1966, the court found in favor of the NSA and entered the following order:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that counter-defendant, The National Spiritual Assembly of the Baha'is of the United States of America Under the Hereditary Guardianship, Inc., its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, including affiliated Local Spiritual

Assemblies, groups, and individuals, or any of them, be and they are hereby enjoined from using in their activities the designations "National Spiritual Assembly of the Baha'is of the United States of America Under the Hereditary Guardianship, Inc.," "Baha'i News Bureau," "Baha'i Round Robin," "Baha'i," trademark representations of the Baha'i House of Worship, the Arabic design "The Greatest Name" and any other designation which by colorable imitation or otherwise is likely to be mistaken for or confused with the counterclaimant's name or marks as indicated above or is likely to create the erroneous impression that counter-defendant's religious activities, publications or doctrines originate with counterclaimant, and from otherwise competing unfairly with counterclaimant or infringing counterclaimant's rights.

(R. 1-1, NSA's Motion for Rule to Show Cause, Ex. A at 24-25.) The NSA-UHG did not appeal the granting of the permanent injunction, (R. 86-2, SIBC/BPUPC Proposed Findings at ¶13; R. 87-1, PNBC Proposed Findings at ¶¶23, 24; R. 88-1, NSA Proposed Findings at ¶5 (indicating that, in early August 1966, Mason Remey instructed the NSA-UHG to withdraw from any action for reconsideration or appeal or other action "regardless of consequences")), and, on December 22, 1966, the NSA-UHG dissolved and ceased all activities. (R. 86-2, SIBC/BPUPC Proposed Findings at ¶29; R. 87-1, PNBC Proposed Findings at ¶¶25, 26.)

In the current proceedings, the NSA contends that the Alleged Contemnors are violating the injunction "through Web publications that utilize marks that are colorable imitations of, or are otherwise likely to be confused with, the NSA's marks." (R. 1-1, NSA's Motion for Rule to Show Cause at 6.) Even though the injunction does not specifically identify the Alleged Contemnors, the NSA argues that the Alleged Contemnors are in privity with the party to the injunction and, thus, are equally bound by it. (*Id.* at 7-13.)

## II.     The Parties

### A.     The NSA-UHG

The NSA-UHG was a not-for-profit corporation organized under the laws of New

Mexico on March 17, 1964.  (R. 88-1, NSA Proposed Findings at ¶23; R. 86-2, SIBC/BPUPC

Proposed Findings at ¶4.)  As stated in its Articles of Incorporation, the NSA-UHG's purpose

was "to provide an administrative structure for all the believers in the Baha'i World Faith located

in the U.S.A."  (R. 132-2, NSA-UHG Art. of Inc. at ¶2.)[1]  The NSA-UHG served as "the

coordinating body for an affiliation of individuals, groups and local spiritual assemblies with

[Mason] Remey at their head."  (R. 88-1, NSA Proposed Findings at ¶30.)  Nine "Members" –

essentially an elected board of directors – governed the NSA-UHG.  (R. 86-2, SIBC/BPUPC

---

[1]     The Baha'i faith originated in Persia with the teachings of the Bab, who foretold that God would soon make manifest a new prophet.  (R. 24-10, Findings of Fact at ¶7.)  In 1863, Baha'u'llah proclaimed himself to be that prophet, and thereafter engaged in several decades of spiritual teaching and writing.  (*Id.*)  Baha'u'llah died in 1892, designating his eldest son, Abdu'l-Baha, spiritual leader of the Baha'i faith.  (*Id.* at ¶8.)  Abdu'l-Baha, in turn, upon his death in 1921, designated his eldest grandson, Shoghi Effendi, as Guardian of the Faith.  (*Id.*; *see also* Hr'g Tr. at 41:5-12 (testimony of Dr. Robert Henderson, elected member of the NSA:  "the essentials of the Baha'i Administrative Order were all defined by Baha'u'llah, who was the prophet founder of the Baha'i faith.  And he named the institutions, defined their purposes and defined their organizing principles and their lines of authority.  That was further detailed by his appointed successor, 'Abdu'l-Baha, and further detailed still by his appointed successor, Shoghi Effendi Rabbani.").)  Three years after Shoghi Effendi's death in 1957, Mason Remey proclaimed himself to be the Second Guardian of the Baha'i Faith.  (R. 24-10, Findings of Fact at ¶21.)  The validity of Mason Remey's claim was a main doctrinal difference between the NSA-UHG, which credited the proclamation, and the NSA, which does not.  (*See generally* Hr'g Tr. at 45:18-47:24.)  The NSA believes instead that, after Shoghi Effendi's death, the world spiritual authority of the Baha'i faith became vested in the Hands of the Cause of God, twenty-seven individuals appointed by Shoghi Effendi as Chief Stewards of the faith who effectuated the devolution of the Baha'i spiritual authority to the Universal House of Justice.  (R. 24-10, Findings of Fact at ¶8.)  Their interim authority ended in 1963 with the formation of the Universal House of Justice, a nine-member body elected by members of the National Spiritual Assemblies throughout the world.  (*Id.*)

Proposed Findings at ¶14.)  As noted above, the NSA-UHG dissolved shortly after the 1966 injunction at the direction of Mason Remey.

### B.      Joel B. Marangella

Joel B. Marangella served as the President of the Second International Baha'i Council,[2] an entity that Mason Remey created and designated as "a body having international jurisdiction over persons throughout the world who were loyal [] Mason Remey."  (R. 87-1, PNBC Proposed Findings at ¶30; *see also* Hr'g Tr. at 122:25-123:1 (indicating that Mason Remey created the Second International Baha'i Council so that he "could work through Joel Marangella . . . as a liaison").)  Although Mr. Marangella did not serve as a Member of the NSA-UHG, he actively participated in that organization and in the underlying litigation.  (R. 88-1, NSA Proposed Findings at ¶¶33, 34 (indicating also that Mr. Marangella so acted "only on behalf of Charles Mason Remey and at his direction").)  On November 12, 1969, Mr. Marangella proclaimed himself to be the Third Guardian of the Baha'i Faith (R. 87-1, PNBC Proposed Findings at ¶51; R. 132-20, Marangella Letter dated Nov. 12, 1969), and thereafter organized the Orthodox Baha'i Faith and certain related entities, including the Provisional National Baha'i Council (R. 87-1, PNBC Proposed Findings at ¶¶61, 66, 67).

### C.      Franklin Schlatter

Franklin Schlatter was a founding member and officer of the NSA-UHG and was actively involved with the activities of the NSA-UHG prior to and at the time of the issuance of the injunction.  (R. 88-1, NSA Proposed Findings at ¶¶44, 45.)  Mr. Schlatter served on the NSA-

---

[2]      The referenced entity is not the Montana corporation that is a party to this contempt proceeding.  (R. 88-1, NSA Proposed Findings at ¶37.)

UHG board that voted to sue the NSA in 1964.  (R. 88-1, NSA Proposed Findings at ¶47.)  Mr. Schlatter also served as PNBC's Secretary from 1978 through 2001 (*id.* at ¶61), and, in 1997, Mr. Marangella appointed Mr. Schlatter as a "Hand of the Cause of God."  (R. 88-1, NSA Proposed Findings at ¶¶48, 49 (asserting that, as a "Hand of the Cause of God," Mr. Schlatter assists, and acts on behalf of, Mr. Marangella).)

### D.    The PNBC

The PNBC is the governing administrative body over those persons residing in the United States who recognize Mr. Marangella as the Third Guardian of the Baha'i Faith.  (R. 87-1, PNBC Proposed Findings at ¶70; *see also* Hr'g Tr. at 197:15-18 (M. Meyer testimony: "The National Bureau was established principally as a center, a focal point for those believers who had decided that Joel Marangella was the Third Guardian.  It had no administrative duties.  It was a service organization.").)  Before changing its official name, the PNBC first was the National Bureau and then the Mother Baha'i Council.  (*Id.* at ¶54.)  At Mr. Marangella's instruction, the National Bureau (formed in the Spring of 1970) transferred its powers to the Mother Baha'i Council on May 23, 1978.  (NSA Hr'g Ex. TX64; R. 88-1, NSA Proposed Findings at ¶55.)  The Mother Baha'i Council thereafter changed its name to the PNBC, again at Mr. Marangella's request.  (R. 88-1, NSA Proposed Findings at ¶55; *see also id.* at ¶¶56-57 (Mr. Schlatter admitting that he participated in the formation of the Mother Baha'i Council), 61 (indicating that Mr. Schlatter served as Secretary for the National Bureau), 62 (indicating that Mr. Schlatter's home address was also the mailing address and corporate address for the PNBC).)  Mr. Marangella appoints all of the PNBC's board members (*id.* at ¶58), and he also has reviewed and approved all decisions made or actions taken relating to the activities and affairs of PNBC and its

predecessors.  (*Id.* at ¶59; *see also id.* at ¶54 (asserting that Mr. Marangella appointed all National Bureau board members and officers, as well).)

### E.  The BPUPC

The BPUPC is a publishing trust formed by Dr. Leland Jensen (*id.* at ¶91), a signatory to the incorporation papers for the NSA-UHG who served as an NSA-UHG Member from April 1963 to May 1964.  (*Id.* at ¶¶80, 82.)  Dr. Jensen formed this organization in 1969 (R. 86-2, SIBC/BPUPC Proposed Findings at ¶37), and, in 1987, the BPUPC incorporated in Montana as a corporation without members.  (*Id.* at ¶¶42, 43.)  The BPUPC publishes "books and pamphlets on Dr. Jensen's interpretation of and beliefs surrounding the Baha'i Faith under the provisions of the Covenant."  (*Id.* at ¶39.)

### F.  The SIBC

Dr. Jensen established the SIBC in 1991 (R. 88-1, NSA Proposed Findings at ¶93), and incorporated that organization two years later.  (*Id.* at ¶95.)  Dr. Jensen was not a director, officer, or Member of the SIBC, but he did appoint the directors of the SIBC.  (R. 86-2, SIBC/BPUPC Proposed Findings at ¶61.)  The SIBC handles "the administrative responsibilities related to the Baha'i faith for all Baha'is Under the Provisions of the Covenant, and SIBC's main responsibility is to give guidance to anybody who requests it."  (*Id.* at ¶51.)

## ANALYSIS

## I.  Conclusions of Law

### A.  Civil Contempt

As an order of a court, an injunction is enforceable through civil contempt proceedings. *See Spallone v. United States*, 493 U.S. 265, 276, 110 S. Ct. 625, 633, 107 L. Ed. 2d 644 (1990)

(it is an "axiom that 'courts have inherent power to enforce compliance with their lawful orders through civil contempt'" (quoting *Shillitani v. United States*, 384 U.S. 364, 370, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966))); *S.E.C. v. Homa*, 514 F.3d 661, 674 (7th Cir. 2008) (a "court whose order was defied must enforce the injunction through the contempt power because contempt is, in essence, an affront to the court that issues the order").  And because "civil contempt proceedings are part of the action from which they stem," *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 920 (7th Cir. 1996), "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy."  *United States v. Rylander*, 460 U.S. 752, 756-57, 103 S. Ct. 1548, 1552, 75 L. Ed 2d 521 (1983) ("The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience.") (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S. Ct. 401, 408, 92 L. Ed. 476 (1948)).  "To win a motion for civil contempt, a party must prove by clear and convincing evidence that the opposing party violated a court order,"[3] *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) (internal quotation omitted)); *Autotech Tech. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 751 (7th Cir. 2007), but "ordinarily" there need not be

_____

[3]          The NSA contends that, "[w]hile it is clear that NSA must demonstrate [a] violation by clear and convincing evidence . . ., the burden for demonstrating privity in this proceeding should be identical to the preponderance of the evidence burden for proving privity as reflected in claim preclusion cases."  (R. 133-1, NSA Br. at 17 n.7 (citing *Graves v. Kemsco Group, Inc.*, 864 F2d 754, 755 (Fed. Cir. 1988) for the proposition that "[i]t is only violations of injunctive order [which] must be proven by 'clear and convincing' evidence").)  The Court disagrees.  Although it appears the Seventh Circuit has not addressed this precise issue, the "clear and convincing" standard logically should apply to all steps necessary to prove contempt – steps that, in this instance, would include the privity determination.  *See, e.g., Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250-51 (2d Cir. 2002).  But, even if the preponderance standard applied, the Court would nonetheless find that the NSA has not carried its burden.

-8-

proof that the violation was "willful," *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989), at least insofar as contempt proceedings relate to a party named in and directly bound by an injunction. *See Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990) ("[T]he focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue."); *cf. New York State Nat'l Org. for Women v. Terry*, 961 F.2d 390, 397 (2d Cir. 1992) (rejecting the argument that the alleged contemnors were not "in active concert or participation" with defendants, as required by Rule 65(d), because their actions "were independently motivated" by their "political, social and moral positions . . .": "We have no reason to doubt this representation, but it is unavailing as an escape hatch from Rule 65(d). The rule is directed to the actuality of concert or participation, without regard to the motives that prompt the concert or participation."). A "district court has considerable latitude in how it goes about enforcing its own decrees in a contempt proceeding." *Rockwell Graphic Sys.*, 91 F.3d at 920.

### B.     Non-Parties and Contempt

Because the Alleged Contemnors were not parties to the original litigation, the critical inquiry here is the extent to which the injunction binds the conduct of non-parties. As a general rule, "a court may not enter an injunction against a person who has not been made a party to the case before it." *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996). As Judge Learned Hand describes the purpose and effect of this general rule:

> [N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter

how broadly it words its decree.  If it assumes to do so, the decree is *pro tanto brutum fulmen*, and the persons enjoined are free to ignore it.  It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court.

*Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (Hand, J.), *cited with approval in Rockwell Graphic Sys.*, 91 F.3d at 919.  Put differently, "[c]ourts do not write legislation for members of the public at large; they frame decrees and judgments binding on the parties before them."  *Additive Controls*, 96 F.3d at 1394.

Yet there are certain exceptions to this principle, as Rule 65 itself suggests.  Indeed, every order granting an injunction not only is binding upon the parties to the action, but also upon "their officers, agents, servants, employees, and attorneys . . . who receive actual notice of the order by personal service or otherwise."  Fed. R. Civ. P. 65(d);[4] *see also Rockwell Graphic Sys.*, 91 F.3d at 919 (the last clause of Rule 65(d) is derived from the common law rule).  For example, consistent with Rule 65, an injunction against a corporation binds that corporation's acting officers (even if not personally named in the injunction) because such an entity "as an incorporeal abstraction" acts only through its agents.  *See Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 417 (7th Cir. 1995).

An injunction also may bind those in "active concert or participation" with the party named in the injunction.  Fed. R. Civ. P. 65(d) (an injunction is binding "upon those persons in active concert or participation with them who receive actual notice of the order by personal

---

[4]     The text of Federal Rule of Civil Procedure 65 has been amended since the NSA initiated this contempt proceeding.  The pertinent part of that Rule, Fed. R. Civ. P. 65(d)(2), now identifies the following as "persons bound:"  "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."  *Id.* (further indicating that an injunction only binds those "who receive actual notice of it by personal service or otherwise").

service or otherwise");[5] *see, e.g., Alemite*, 42 F.2d at 832 ("[A] person who knowingly assists a

defendant in violating an injunction subjects himself to civil as well as criminal proceedings for

contempt. This is well settled law."). "The interpretation of 'active concert or participation' has

engendered two lines of cases in which parties not named in an injunction are bound thereby:"

> First, an injunction may bind nonparties who are successors in interest to parties named
> in the injunction with respect to the subject matter of the injunction. *Golden State
> Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 179-80, 94 S. Ct. 414, 422-23, 38 L. Ed. 2d 388
> (1973); *Herrlein v. Kanakis*, 526 F.2d 252, 253-54 (7th Cir. 1975); *Brunswick Corp. v.
> Chrysler Corp.*, 408 F.2d 335, 339 (7th Cir. 1969). Second, parties otherwise without an
> injunction's coverage may subject themselves to its proscriptions should they aid or abet
> the named parties in a concerted attempt to subvert those proscriptions. *Regal Knitwear*,
> 324 U.S. at 14, 65 S. Ct. at 481; *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431,
> 436-37, 54 S. Ct. 475, 477 (1934); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d
> Cir. 1930) . . . . These rules may also apply in somewhat hybrid fashion in a case where a
> successor corporation is formed essentially for the purpose of carrying on the enjoined
> activity. *Cf. Panther Pumps & Equip. v. Hydrocraft, Inc.*, 566 F.2d 8, 24-25 (7th Cir.
> 1977), *cert. denied*, 435 U.S. 1013, 98 S. Ct. 1887, 56 L. Ed. 2d 395 (1978).

*Rockwell Graphic Sys.*, 91 F.3d at 919-20. In other words, an injunction not only binds the

parties identified in the injunction but also those in "privity" with them. *Regal Knitwear Co. v.

Nat'l Labor Relations Bd.*, 324 U.S. 9, 14, 65 S. Ct. 478, 481, 89 L. Ed. 661 (1945).[6] "These

---

[5]     This is the language of the old version of Fed. R. Civ. P. 65; the new version is substantially similar.

[6]     As the authorities within the above-cited excerpt demonstrate, the two lines of cases rest on slightly different theories: (1) that Rule 65 "is not a bar to judicial enforcement of the Board order entered against the bona fide successor[s] . . . [because] [p]ersons acquiring an interest in property that is a subject of litigation are bound by, or entitled to the benefit of, a subsequent judgment, despite a lack of knowledge," *Golden State Bottling*, 414 U.S. at 179, 94 S. Ct. at 422-23; and (2) that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding," *Regal Knitwear*, 324 U.S. at 14, 65 S. Ct. at 481. These distinct policies may independently inform the ultimate analysis as to whether privity exits. *See, e.g.,* Wright & Miller, 11 FED. PRAC. & PROC. §2956 ("the best way to approach the question of 'privity' may be to analyze the facts of each case in order to determine whether the requisite relationship exists between those enjoined and those against whom a contempt proceeding has been brought to justify a finding

constructions of the 'active concert or participation' language of Rule 65(d) recognize that the objectives of an injunction may be thwarted by the conduct of parties not specifically named in its text." *Rockwell Graphic Sys.*, 91 F.3d at 920.

## II.     Application To The Court's Findings of Fact

Applying the above-stated principles here, none of the Alleged Contemnors is in privity with the bound entity, and thus none has violated the injunction.  In rendering this finding, the Court has carefully and deliberately weighed all of the evidence adduced at the hearing and otherwise submitted by the parties.  The Court closely assessed the demeanor of each testifying witness, including his or her body language, tone of voice, facial expressions, mannerisms, and other factors indicative of credibility.

### A.     Mr. Schlatter, Mr. Marangella, and the PNBC Are Not In Contempt

The NSA asserts various theories of privity regarding this group of Alleged Contemnors. The Court will begin its analysis with Mr. Schlatter, but, as shown below, the same analysis applies to Mr. Marangella, and the PNBC.  The NSA argues that Mr. Schlatter is bound by the injunction because he was a founder, incorporator, and officer of the NSA-UHG, and was an active member of the NSA-UHG's litigation committee that oversaw the original litigation.  (*See* R. 133-1, NSA Br. at 2-3.)  As the NSA sees things, Mr. Schlatter is bound because "the legal effect of an injunction does not end with the dissolution of the enjoined entity.  Rather, an injunction 'survives the dissolution of the corporate defendant' and remains enforceable against

_____

that the latter are in privity with the former"); *see also Rockwell Graphic Sys.*, 91 F.3d at 919-20 ("[a] court must consider the extent of the alleged 'active concert or participation' of third parties with those named in the injunction in determining whether the injunction's prohibitions shall apply to those third parties").

persons who are bound by the injunction including the corporation's *former* officers, agents, employees, and those in active concert or participation with them."  (R. 133-1, NSA Post-Trial Br. at 17 (emphasis added).)

### 1.     The NSA's Legal Theory Is Overbroad

Certain of the NSA's legal assertions are not controversial.  It is true that officers and directors of an enjoined corporation (or any other incorporeal organization) are bound as acting agents of that entity.  *See Reich*, 50 F.3d at 417 ("An order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents.  A command to the corporation is in effect a command to those who are officially responsible for its affairs." (internal quotation omitted)).  As discussed above, it is also true that an injunction survives the dissolution of a corporation when a bound corporation transfers its liabilities to a bona fide successor-in-interest, *see Golden State Bottling*, 414 U.S. at 179-80, 94 S. Ct. at 422-23, or when a successor corporation is formed for the purpose of avoiding the effects of an injunction, *Rockwell Graphic Sys.*, 91 F.3d at 919-20.  What the NSA's cited authority leaves unanswered, however, is whether *former* officers and directors of a dissolved entity continue to be bound if they later act on behalf of an entity that is *not being employed as a means to avoid the injunction*.[7]  Put differently, are they forever bound, though not originally named as parties,

---

[7]     Whether the PNBC is in effect the same entity as the NSA-UHG is the critical determination on this record.  The PNBC theoretically could be bound as a bona-fide successor-in-interest the NSA-UHG.  The record, however, does not support this inference.  Although the PNBC is the legal successor-in-interest to the National Bureau and the Mother Baha'i Council (*see* NSA Hr'g Ex. TX64; R. 88-1, NSA Proposed Findings at ¶55), there apparently was no similar transfer of legal interests between the NSA-UHG and the National Bureau.  *Cf. Golden State Bottling*, 414 U.S. at 179-80, 94 S. Ct. at 422-23; *see also Herrlein v. Kanakis*, 526 F.2d 252, 254-55 (7th Cir. 1975) ("The cases holding successors in interest liable for violating injunctions against their predecessor in interest have only so held when the transfer was

*solely* by virtue of once being an officer or director of a bound entity?

In its proposed conclusions of law, the NSA asserts that *Walling v. James V. Reuter, Inc.*, 321 U.S. 671, 64 S. Ct. 826, 88 L. Ed. 1001 (1944) supports this proposition. It does not. In that case, the Supreme Court held that an injunction is "enforcible [*sic*] by contempt proceedings against the corporation, its agents and officers and those individuals associated with it in the conduct of its business, but it may also, in appropriate circumstances, be enforced against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons. The vitality of the judgment in such a case survives the dissolution of the corporate defendant." *Id*. at 674, 64 S. Ct. at 828. These propositions are merely the same non-controversial propositions mentioned in the previous paragraph, or, more accurately, the "hybrid" application identified in *Rockwell Graphic Sys*. *See* 91 F.3d at 919-20. The *Walling* court, that is, found only that "a family business" could not "successfully avoid[] all responsibility for compliance with the judgment entered against the family corporation, by the simple expedient of dissolving it and continuing the business under the individual control of members of the family." *Id.* The dissolution, in that case, was possibly a sham designed to avoid the injunction. *Id.* (holding that dissolution did not render the case moot and remanding the contempt issue). *Walling* thus does not consider whether former officers and directors of a bound entity are bound even after they disassociate with that entity.

Nor does the authority the NSA cites in its briefs. In fact, the NSA's cited authority

---

undertaken after the time the injunction order was imposed or the proscribed act was committed. The reason for these holdings is manifest: to allow a named party to avoid an injunction through the transfer of assets would provide an easy method of defying court orders."). Thus, the chain of successorship lacks a link.

squarely undercuts the NSA's position: "[a]n injunction issued against a corporation or association binds the agents of that organization to the extent they are acting on behalf of the organization. Generally, persons who cease to act in one of the designated capacities are no longer bound by the decree." *New York ex rel. Vacco v. Oper. Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) (further noting that "an organization and its agents may not circumvent a valid court order merely by making superficial changes in the organization's name or form, and in appropriate circumstances a court is authorized to enforce its order against a successor of the enjoined organization"); *Regal Knitwear*, 324 U.S. at 13, 65 S. Ct. at 481 (courts "may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently. . ."); *Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8 (7th Cir. 1977) (acting officer of a corporation bound by injunction, although not personally named, and could not transfer the bound corporation's assets to another entity to avoid an injunction). (*See also* R. 137-1, NSA Reply at 14-15 (citing these cases).) Additional authority also runs contrary to the NSA's position. *See Alemite*, 42 F.2d at 833 ("the only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, *an act of a party*" (emphasis added)); *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 43 (1st Cir. 2000) ("[a] nonparty who has acted independently of the enjoined defendant will not be bound by the injunction"); *Additive Controls*, 96 F.3d at 1395 (construing *Alemite*: "[t]he court [] concluded that the non-party, Joseph Staff, could be held in contempt of the injunction against his former employer (the enjoined party) if, *but only if*, Staff aided and abetted his former employer in violating the injunction. Staff could not be held in contempt for acts performed

independently of his employer." (emphasis added; parentheses in original)); *Saga Int'l, Inc. v. John D. Brush & Co., Inc*., 984 F. Supp. 1283, 1286 (C.D. Cal. 1997) ("an officer is bound by an injunction against his corporation *only in his capacity as an officer*" (emphasis original)); *Matrix Essentials v. Quality King Distributors, Inc*., 346 F. Supp. 2d 384, 391 (E.D.N.Y. 2004) ("Where an agent ceases acting on behalf of the corporation, he is no longer bound by the injunction."); *see also United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998) (a district court may not enjoin non-parties who are neither acting in concert with the enjoined party nor are in the capacity of agents, employees, officers, of the enjoined party).

 The Court is mindful that at least one circuit case seems to suggest that a former officer may be forever bound in a personal capacity even if not named as a party in an injunction proceeding.  *See G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 37 (1st Cir. 1980).  *Merriam* suggests that a "key employee" of a dissolved corporation may be forever bound, even if not personally named in the injunction, if that employee is "legally identified" with a bound party, *i.e.*, if the employee is "so identified in interest with those named in the decree that it would be reasonable to conclude that [his] rights and interests have been represented and adjudicated in the original injunction proceeding."  *Id*. (describing the issue before the court:  "Was George Hoskins [a non-party] within the permissible scope of contempt proceedings because he was 'legally identified with' Webster Dictionary Company [a party] when the injunction was issued and for that reason continued to be subject to the injunction even after Webster Dictionary Company went out of existence?").  This apparently would be true absent a finding of aiding and abetting, *id.* at 35 ("because no contumacious act of John Hoskins [a bound individual] or Webster Dictionary Company [the bound entity] has been found, [the

former key employee] and his [newly-formed companies] cannot be held on the basis of aiding or abetting them"), as long as the former employee had substantial responsibilities within the enjoined corporation, participated in the litigation, and there is some degree of similarity between the employee's activities in the old and new businesses. *Id.* at 37-40; *see also Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1352 (Fed. Cir. 1998) (citing *Merriam* with approval). The "central reason" for this holding, the *Merriam* court noted, was that without these showings a non-party would not have "had his day in court with respect to the validity of the injunction." *Merriam*, 639 F.2d at 37.

There is a silent tension between the *Merriam* decision and *Alemite*.[8] The latter holds that a non-party may be bound by an injunction only if the non-party is acting on behalf of the enjoined entity.[9] The former has the practical effect of binding a non-party absent any such

---

[8]     The *Merriam* court did not take issue with *Alemite*'s holding, but rather distinguished it on the facts:

> Although there are definite factual similarities between *Alemite* and the instant case, the two are distinguishable. Joseph Staff was described merely as a "salesman" for his brother's corporation. No participation of Joseph in the planning and direction of the activities causing the original patent infringement is disclosed. In contrast, on the evidence in the record before us, George Hoskins may fairly be found to have been a "managing official". Nor is there any indication that the successor firm in *Alemite* was so nearly identical to the original defendant in its business and mode of operation as is the case here, or of any overlap of Joseph Staff's service to the two companies. In short, the facts recited in *Alemite* disclosed none of the factors that, in this case, would support a finding that George Hoskins was legally identified with Webster Dictionary Company when the injunction was issued.

*Merriam*, 639 F.2d at 39.

[9]     As noted above, and as suggested in *Alemite*, non-parties may also be bound as bona fide successors-in-interest, or if they are merely a sham entity created to avoid the effects of an injunction. *See Alemite*, 42 F.2d at 833.

showing.

The Court respectfully disagrees with the exception that *Merriam* carves out from the *Alemite* rule.[10]  First, *Merriam*'s rationale rests upon a due process concern for the non-party – *i.e.*, that the non-party must in effect have his day in court – but, equally important, though left aside in the *Merriam* opinion, is the independent concern that courts lack the power to adjudicate matters except as to parties.  *See Alemite*, 42 F.2d at 832 ("no court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.").  The Court sees no reason why a non-party's "substantial responsibilities" in a corporation combined with "a key role in the corporation's participation in the injunction proceedings" would render the non-party directly subject to a court's order:  these factors, no matter their weight, do not speak to the limits of a court's adjudicative authority.  *See also Kirschenbaum*, 156 F.3d at 794 ("A district court may not enjoin non-parties who are neither acting in concert with the enjoined party nor are in the capacity of agents, employees, officers, etc. of the enjoined party.").

Second, to the extent *Merriam* suggests that a non-party may be engrafted onto an injunction, it runs headfirst into a line of cases saying just the opposite – namely, that "[i]t is elementary that one is not bound by a judgment *in personam* resulting from litigation in which

---

[10]     While citing *Merriam* with approval on other points, *see Reich*, 50 F.3d at 417; *Connolly v. J.T. Ventures*, 851 F.2d 930, 935 (7th Cir. 1988); *Polk Bros., Inc. v. Forest City Enter., Inc.*, 776 F.2d 185, 195 (7th Cir. 1985); *Illinois Dept. of Public Aid v. U.S. Dept. of Health & Human Servs.*, 772, F.2d 329, 332 (7th Cir. 1985), the Seventh Circuit has never expressly adopted *Merriam*'s rationale on this particular issue, and the Seventh Circuit's *dicta* in *Rockwell Graphic Sys.* indicates that it likely would not.  *See Rockwell Graphic Sys.*, 91 F.3d at 919-20 (noting that there only certain exceptions to the rule that only a party may be bound by an injunction and citing *Merriam* as a recent application of aiding and abetting named parties).

he is not designated as a party or to which he has not been made a party by service of process."

*Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 110, 89 S. Ct. 1562, 1569, 23 L. Ed. 2d 129 (1969).  As the Supreme Court explained in *Zenith Radio*, this rule holds true even when the non-party maintains a "key role" in litigation proceedings against a bound entity:

> Perhaps Zenith could have proved and the trial court might have found that HRI and Hazeltine were alter egos; but absent jurisdiction over Hazeltine, that determination would bind only HRI.  * * *  The trial court's judgment against Hazeltine was based wholly on HRI's stipulation [that HRI and its parent company, Hazeltine, were one and the same entity].  HRI may have executed the stipulation to avoid litigating the alter ego issue, but this fact cannot foreclose Hazeltine, which has never had its day in court on the question of whether it and its subsidiary should be considered the same entity for purposes of this litigation.

> Likewise, were it shown that Hazeltine through its officer, Dodds, in fact controlled the litigation on behalf of HRI, and if the claim were made that the judgment against HRI would be res judicata against Hazeltine because of this control, that claim itself could be finally adjudicated against Hazeltine only in a court with jurisdiction over that company.

> Neither the judgment for damages nor the injunction against Hazeltine was proper. Although injunctions issued by federal courts bind not only the parties defendant in a suit, but also those persons 'in active concert or participation with them who receive actual notice of the order by personal service or otherwise,' Fed. Rule Civ.Proc. 65(d), a nonparty with notice cannot be held in contempt *until shown to be in concert or participation*.

*Zenith Radio*, 395 U.S. at 111-12, 89 S. Ct. at 1570 (footnotes and certain internal citation omitted; emphasis added); *see also Lake Shore Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007) ("The district judge evidently was confident that other members of the Lake Shore Group of Companies are 'in active concert or participation with' Lake Shore Asset Management, and that may well be true.  But so far none of these other entities has been served with process and given an opportunity to present evidence.  That is essential before any enforcement action may be taken against a non-litigant.  *Zenith Radio* held that even a defendant's concession that some additional entity is the defendant's alter ego does

not warrant an injunction against that entity, until it has been served with process and offered the opportunity to say whether it agrees with the original defendant's concession."); *Microsystems Software*, 226 F.3d at 42-43 (citing *Merriam*, but concluding that if "the party prosecuting the contempt proceeding fails to show active concert or participation, a finding of contempt will not lie."). As this passage makes clear, a non-party's role in litigation proceedings cannot render the non-party "legally identified" with a bound party. *Zenith Radio*, that is, teaches that a non-party cannot be personally bound by an injunction unless that non-party has had an *actual* day in court in its own right. Accordingly, the Court respectfully declines to follow *Merriam*'s holding to the extent it holds that a non-party may personally be forever bound if "it *can be fairly said* that he has had his day in court in relation to the validity of the injunction." *Merriam*, 639 F.2d at 37 (emphasis added); *cf. Waffenschmidt v. MacKay*, 763 F.2d 711, 718 (5th Cir. 1985) ("By actively aiding and abetting MacKay, Currey and Johnson placed themselves within the personal jurisdiction of the district court. *Zenith [Radio]* does not deny jurisdiction to a court whose order is so contempted.").

As is relevant here then, Mr. Schlatter is not personally bound by the injunction; rather, he falls within its scope only if he engaged in the alleged contemptible acts on behalf of the NSA-UHG. There is, however, an added wrinkle on the present facts. Because the NSA-UHG no longer exists, the Court must determine whether Mr. Schlatter is an acting agent for an entity that is effectively the same as the bound entity, despite a change in incorporeal formalities – a fact-sensitive and "elusive" inquiry that looks to "whether there is a substantial continuity of identity between the two organizations." *Vacco*, 80 F.3d at 70-71 ("[w]hether a new organization is the successor of an enjoined organization depends upon the facts and

circumstances of the case * * * [w]e are aware of the difficulties faced by a trier of fact in cases such as this, where similarly constituted groups of individuals move fluidly between multiple unincorporated associations that share the same basic leadership and goals"); *see also, e.g., Rockwell Graphic Sys.*, 91 F.3d at 919-20 (7th Cir. 1996) (a non-party entity may be bound "in a case where [the] successor corporation is formed essentially for the purpose of carrying on the enjoined activity"); *Reich*, 50 F.3d at 415 (successor corporation bound where president and sole stockholder of enjoined entity "had drained the firm of assets and transferred boatbuilding operations to a newly formed corporation, Continental Marine, for which [the sole stockholder] occupied the same roles. Continental took up business on Sea Sprite's old premises and using its methods . . . [The sole shareholder] explained that he formed Continental because Sea Sprite had too many unsatisfied judgments against it and was being hounded by creditors."). And because there is no dispute that Mr. Schlatter and Mr. Marangella in fact act as agents on behalf of the PNBC (*see, e.g.,* R. 88-1, NSA Proposed Findings at ¶¶58, 59, 61, 63), their fortunes in this contempt proceeding rise and fall together.

## 2. The PNBC Is Not In Privity with the NSA-UHG

Turning to the record, the Court finds that the PNBC[11] is not so similar to the NSA-UHG as to compel a finding of privity.[12] (*See also* R. 133-1, NSA Br. at 4 (asserting that the PNBC is bound by the injunction because, after the injunction issued, "people bound by its restrictions,

---

[11]    When referring to the PNBC in this section, the Court is referring to the PNBC collectively with its predecessors, the National Bureau and the Mother Baha'i Council.

[12]    The factual analysis here is more "elusive" than that at issue in many of the above-cited authorities because, unlike a comparison between brick-and-mortar businesses, *see, e.g., Reich*, 50 F.3d at 415; *see also, e.g., Additive Controls*, 96 F3d at 1392, the defining characteristics of the entities here are ethereal, not concrete. *See Vacco*, 80 F.3d at 70.

including Joel Marangella, UHG officers and directors and UHG followers formed the National Bureau," which in turn became the Mother Baha'i Council, which later changed its name to the PNBC).)  Foremost, while the NSA-UHG always followed Mason Remey's directives, (*see* Hr'g Tr. at 214:4-7 (establishing through credible testimony that the NSA-UHG always followed Mason Remey's directives:  "Q. Can you think of any decision – well, let me ask you this [] way: Did the UHG obey all of [Mason Remey's] decisions?  A. We did.  Q. Was there any decision they failed to obey?  A. No.")), the PNBC did not similarly do so.  After Mr. Marangella proclaimed that Mason Remey had appointed him to be the Third Guardian of the Baha'i Faith, those that credited Mr. Marangella's proclamation – like Mr. Schlatter and Ms. Meyer, both of whom testified credibly at the hearing – no longer accepted Mason Remey's continuing claim to the Guardianship or his authority:

> Q. Are you still a member of – or not a member, but a follower under the UHG?
> A. No.
> Q. When did you cease to become a member?  Or a follower, sorry.
> A. Of the UHG?
> Q. Yes, or of Mason Remey.
> A. Well, of Mason Remey, I – I can say that when I sent my letter to Joel Marangella accepting his Guardianship in December of 1969, that I had made my separation from Mason Remey entirely.

(Hr'g Tr. at 144:8-15, 225:14-226:17 (M. Meyer testimony indicating that she had "left Mason Remey"); *see also* Hr'g Tr. at 224:19-24 (M. Meyer testimony:  "Q. Do you know whether Mason Remey was involved with the Orthodox Baha'i Faith in any way?  A. He was not involved with the Orthodox Baha'i Faith as it was established under Joel Marangella.  Q. Did he have any relationship to the Orthodox Baha'i Faith? A. He did not.").)[13]  Each member of the

---

[13]      To be clear, the PNBC's membership still accepts Mason Remey's initial claim to the Guardianship.  The membership, however, does not credit Mason Remey's continuing claim

PNBC similarly had to separate himself or herself from Mason Remey's continuing claim to the Guardianship (*id.* at 144:19-23 (to join the PNBC "one had to do it individually. It was one of those things where everybody received a copy of Joel Marangella's proclamation, and each individual, on his or her own, responded according to whatever he or she felt was the way to go. They either accepted or they didn't accept.")), and implicitly from Mason's Remey's later appointment of Donald Harvey as Third Guardian, and Mr. Harvey's line of successors. (*See also* Dep Tr. of J. Marangella at 25:6-16 ("Q. So the implication, then, you mentioned earlier, of his appointment, that implication was that you were to be his successor and the third guardian?

---

to the Guardianship in the time period following Mr. Marangella's proclamation. (*See* Dep. Tr. of J. Marangella at 102:10-20 ("Q. So there's continuity between the Orthodox Baha'i Faith and this Hereditary Guardianship group. . . . It says here that the contribution to Mason Remey as head of the Orthodox Baha'i Faith is the same as Baha'i Faith under Hereditary Guardianship. A. I was talking about the Guardian. He was the Guardian and I'm the Guardian – the successor Guardian, so in that sense there was continuity, but I don't recognise [*sic*] the continuity with the Assembly per se."); *see also* Hr'g Tr. at 149:12-19 (Schlatter testimony: "Q. And those were people that accepted Mason Remey as the Second Guardian? A. Yes. Q. And as you sit here today, you're a believer, correct? A. Yes. Q. And that's because you still accept Mason Remey as the Second Guardian? A. Indeed I do."), 218:13-19 (M. Meyer testimony: "Q. You no longer believed [Mason Remey] was the leader of your faith, the Guardian? A. My – my belief at that time was although he might occupy the station, he was not fulfilling the responsibilities. In my mind, it was more like he became a respected elder statesman, but we didn't – no longer did what he said because it was contrary to the basic writings of the Baha'i faith.").) In fact, at least some of the PNBC's leadership affirmatively considered Mason Remey to be engaging in "aberrant" behavior in the years following the NSA-UHG's dissolution. (Hr'g Tr. at 226:22-227:10 (M. Meyer testimony: "A. As I said before, Mason Remey was becoming increasingly erratic in his pronouncements, and I'm afraid I put this in the same class as an aberrant act. Q. Why was it an aberrant act? A. Because he had previously – this – okay. This was – because he had previously, in appointing the Second International Baha'i Council, indicated that Joel B. Marangella was to be his successor before he became aberrant. So – so this was, in my opinion, in the period when he became erratic and incoherent and aberrant, so I did not take it as valid."); *see also* Hr'g Tr. at 143:12-17 (Schlatter testimony: in the years following dissolution, Mason Remey issued "instructions, [that] as far as I was concerned, were about 180 degrees from what kinds of statements he had been making previously. I found them very, very difficult to follow; and so, too, did many of the believers. We were having difficulty coping with the kinds of statements that he was making. And they were religious statements.").)

A. Well, there was every indication in those days that I was to be his successor, yes, and of course, later on, he revoked that and appointed Donald Harvey – 1969. Q. When you say that he revoked that – A. Well, in effect, he revoked it by appointing, in May '69 – appointing Donald Harvey as the successor, which of course, came as a great shock to me.").) Thus, contrary to the NSA's portrayal, the NSA-UHG and the PNBC centered around two very distinct and, for a time, conflicting sources of actual authority, that of Mason Remey and that of Joel B. Marangella, respectively. (*See* Dep. Tr. of J. Marangella at 91:20-92:3 (A. * * * a lot of those people continue to recognise [*sic*] Donald Harvey [as Guardian]. Q. But you state that you're the third Guardian. A. But they have not accepted my Guardianship. They stuck with Mason Remey until he died in 1974, then they accepted Donald Harvey. To this day they accept [ ] Donald Harvey's successor Jacques Soghomonian who he appointed.").) Given that, on a defining point of organizational purpose, there existed a robust doctrinal divide between the NSA-UHG and the PNBC, the Court cannot conclude that the PNBC is operating in effect as the NSA-UHG, or that there is otherwise a substantial continuity between the two groups.

Moreover, the PNBC's membership – which currently includes roughly 30 to 40 individuals (Hr'g Tr. at 199:14-19) – did not in fact encompass all of the same individuals that comprised the NSA-UHG. (*See, e.g.*, Hr'g Tr. at 141:14-142:1 (Schlatter testimony: "Q. And did [your brother] ever join the Orthodox Baha'i Faith? A. No. Q. What happened to him after? A. He followed Mason Remey. Q. He continued to follow him after – A. He followed Mason Remey after Joel Maran– Joel Marangella declared himself in November – November 12th – of 1969. And he wrote a letter – my – actually, he and his wife developed a letter saying that they could not accept Joel B. Marangella as the Third Guardian, and they continued to follow Mason

Remey. They and some others, like the Murphys and other individuals, followed Mason

Remey . . . .").) In fact, from its inception, the PNBC's membership differed materially from

that of the NSA-UHG, as contemporaneous documentation confirms. (R. NSA Hr'g Exs. 021-

22; *cf.* NSA Hr'g Exs. 027, 061-63; *see also* PNBC Hr'g Ex. OBF-1 (demonstrative chart

depicting the affiliation of certain NSA-UHG Members following dissolution).)[14]

Finally, the vast weight of the record evidence establishes that the PNBC was not formed

for the purpose of escaping the confines of the injunction. In fact, Ms. Meyer testified credibly

that the opposite proposition was true:

> Q. Did you ever discuss the possibility of violating that judgment?
> A. We did not.
> Q. Why not?
> A. We were thoroughly – I mean, we were informed what the thing was. And the other
> part of it was fear because the injunction threatened us as individuals that if we used the
> name "Baha'i," they could do something drastic to us. So we did not – no, we did not
> intend or talk about violating the judgment.

(Hr'g Tr. at 215:18-216:2; *see also* Hr'g Tr. at 223:8-12 (M. Meyer testimony: "So what did you

understand that [Mr. Marangella] was saying [in his letter regarding the injunction]? A. He was

---

[14]    In its brief, the NSA asserts that, "[a]t the hearing, Mr. Schlatter confirmed that
all nine members of the UHG board joined the National Bureau as either board members or
followers." (R. 133-1, NSA Br. at 6.) This is not an accurate summary of Mr. Schlatter's
testimony. His testimony was not that all nine Members of the UHG board joined the National
Bureau, but that all National Bureau followers (listed in Article VII of the National Bureau's
articles of incorporation) had belonged to the NSA-UHG. (*See* Hr'g Tr. at 109:13-25 ("Q.
Article 7 indicates that James Meyer was Chairman of the National Bureau; is that right? A.
Yes. * * * Q. And the members of – the other members of – the National Bureau are also listed
there, as well, aren't they? A. Yes. Q. Isn't it true that each of those members was either a
member of UHG previously or a follower under UHG's jurisdiction? A. Yes.").) A comparison
of Article VII with the list of UHG Members upon dissolution reveals as much. (PNBC Hr'g Ex.
OBF-15; *cf.* SIBC/BPUPC Hr'g Ex. SB-24.) So, the upshot of this testimony is that the National
Bureau's following consisted of a subset of the NSA-UHG's following – a subset that, as just
noted, differs materially from the NSA-UHG.

saying and he was telling us that we had no intent of violating the injunction; that when it became available, we might want to do something about it. In the meantime, we had to essentially live with it.").) Mr. Schlatter testified to the same effect, (Hr'g Tr. at 135:5-7 ("[W]e did not want to violate the injunction. Let's put it that way. We were very, very much concerned about our legal status"); *see also* Hr'g Tr. at 130:9-21), and further testified that, far from engaging in enjoined activity, the so-called "remnants" of the NSA-UHG remained effectively dormant for roughly two years after the injunction issued:

> Q. What, if anything, did the Remey believers do after the dissolution?
> A. Nothing.
> Q. And do you know, did you hear from the Second International Baha'i Council after that time?
> A. No.
> Q. Prior to 1969, did you hear from Joel B. Marangella?
> A. No.
>
>              \*     \*     \*
>
> Q. Now, did you still consider yourself a follower of Mason Remey after the dissolution?
> A. Yes.
> Q. Did you consider yourself an officer?
> A. No.
> Q. Did you have any leadership role at all after 1966 in the UHG?
> A. There was nothing to be a leader of.
>
>              \*     \*     \*
>
> Q. Now, the – what I call, the remnant – which would include the Board members of the NSA and, also, the followers of Remey after the dissolution; the remnant – did engage in activity after '66 of some kind?
> A. There was no activity.

(Hr'g Tr. at 129:4-23, 131:1-5.) And, although intent to comply with an injunction may not be dispositive, *cf. Stotler & Co.*, 870 F.2d at 1163; *Howard Johnson*, 892 F.2d at 1516; *Terry*, 961 F.2d 397, it nonetheless is relevant. *See Rockwell Graphic Sys.*, 91 F.3d at 919-20 (a

successor corporation may be bound by an injunction if it "is formed essentially for the purpose of carrying on the enjoined activity").

Taken together the record evidence establishes that the PNBC is not in privity with NSA-UHG. Although there are certain organizational similarities between the PNBC and the NSA-UHG, (R. 133-1, NSA Br. at 7 (asserting that (1) the PNBC's nine-member board consists of at least four individuals who served on the UHG board or who were followers under its jurisdiction; (2) that Members James Meyer and Marilyn Meyer participated in both entities' publishing efforts; and (3) that the NSA-UHG and the PNBC used the same mailing address)), the NSA nonetheless has failed to establish privity by clear and convincing evidence. Rather, the vast weight of the record (including credible testimony) reflects that there was a significant doctrinal rift on a critical tenet of each group's faith, and that the PNBC's membership varied materially from that of the NSA-UHG. The record further reflects a demonstrable lack of intent to violate the injunction, and that the PNBC was not created to avoid the effect of the injunction. Simply put, there is no substantial continuity between the NSA-UHG and the PNBC, and, as a result, Mr. Schlatter, Mr. Marangella, and the PNBC have not violated the injunction.

### B.       The SIBC and the BPUPC Are Not In Contempt

The NSA contends that the SIBC and the BPUPC are bound on two independent grounds: (1) because Leland Jensen, an individual supposedly subject to the injunction, created those entities, and (2) because they have admitted to being "successors-in-interest to Mason Remey with respect to the subject matter" of the injunction. (R. 133-1, NSA Br. at 7-8.) Both arguments are unavailing.

### 1.       Evidence Adduced at the Hearing

The NSA's first argument is much the same as that asserted against the other Alleged Contemnors.  The NSA contends that the "BPUPC and SIBC were bound at inception because they were formed and controlled by Dr. Jensen, who himself was bound as an affiliated individual and a member of an affiliated group at the time the injunction was entered."  (R. 133-1, NSA Br. at 11; *see also* Hr'g Tr. at 13:5-9 (argument of counsel: "independently, [the SIBC and the BPUPC are] bound because they were created by Leland Jensen, who, himself, was subject to the injunction as a member of an affiliated group who had several ties to the UHG at the time the injunction was entered.").)  As noted above, this argument fails as a matter of law.

The argument fails on the facts, as well.  The NSA agues that Dr. Jensen was affiliated with the NSA-UHG when the injunction issued because:  (1) Dr. Jensen "was an incorporator of the UHG and served as one of its first nine board members," (2) Dr. Jensen "was the leader of UHG's Joplin, Missouri Local Spiritual Assembly," (3) Dr. Jensen and his wife Opal "composed UHG's entire Missoula, Montana group," and (4) that contemporaneous documents, "including membership lists, election results and correspondence logs demonstrate that [Dr.] Jensen . . . remained in the group and [was] bound by the injunction."  (R. 133-1, NSA Br. at 12.)  None of these facts is particularly probative.

At best, the cited facts demonstrate that Dr. Jensen participated in the NSA-UHG around the time of its inception in 1963.  Ample evidence, however, demonstrates that Dr. Jensen disassociated himself from the group shortly thereafter and well before the injunction issued.  Indeed, Mr. Schlatter testified directly and credibly to that effect:

Q. Was Dr. Jensen ever active in the NSAUHG after he failed to be re-elected in 1964?
A. No.

-28-

Q. Did he ever serve on any NSAUHG committees after 1964?
A. No.
Q. Did he ever participate in any NSAUHG meetings after 1964?
A. No.
Q. Did he ever attend any NSAUHG conferences after 1964?
A. No.
Q. And you were the Secretary of the NSAUHG the entire time it existed, correct?
A. Yes.
Q. And other than that membership form that you talked about earlier, did John – did Dr. Jensen ever correspond with the NSA after 1964?
A. No. Dr. Jensen, himself, did not.
Q. Okay. And after 1964, did Dr. Jensen ever correspond with you personally?
A. No.
Q. So, it's fair to say that Dr. Jensen disassociated with the NSAUHG after he was not re-elected in 1964?
A. He has made that statement.

(Hr'g Tr. at 163:14-164:11; *see also* Hr'g Tr. at 159:22-163:13 (describing Dr. Jensen's falling

out with the NSA-UHG board).) That Dr. Jensen appeared on the NSA-UHG's membership lists

is not significant because an individual Member or Believer had to affirmatively request

removal. (Hr'g Tr. at 168:22-169:4 (Schlatter testimony: "Q. I note that Dr. Jensen's name was

on the NSAUHG's mailing list. How do names get on that mailing list? A. Individuals have to

identify themselves as being members of the faith under the Hereditary Guardianship, and they

get on that list. Q. How did names get taken off the list? A. The individual has to ask for it to be

taken off or the individual dies, one or the other. Q. So, someone has to take – once you're on

the list, you have to take an affirmative step to get off the list? A. Yes.") Nor is it determinative

that Dr. Jensen received votes for board membership after his only year of service as a NSA-

UHG Board Member. (*See* Hr'g Tr. at 146:8-147:1 (Q. [] [C]andidates were not nominated for

election, were they? A. That is correct. Q. And under the NSAUHG's rules, no one could

campaign to be elected? A. That is correct. Q. So, delegates could vote for anyone that they

wanted to serve as a member of the NSAUHG? A. Yes. * * * Q. The NSAUHG members didn't

vote on their successors; it was actually a vote of the delegates? A. It was a vote of the delegates.); *see also* Hr'g Tr. at 164:16-165:16.) For these reasons, the Court concludes that, contrary to the NSA's assertion, Dr. Jensen was not affiliated with the NSA-UHG when the injunction issued, but rather had disassociated himself well before that time.

### 2. Prior Admissions

In the alternative, the NSA argues that the SIBC and BPUPC have admitted privity in "sworn declarations filed with the United States Patent and Trademark Office." (R. 133-1, NSA Br. at 8 (further contending that the SIBC and BPUPC sought to "tack-on" their trademark rights to those of Mason Remey by referencing their legal chain of title to the trademarks and relying upon rights inherited from Mason Remey as a predecessor-in-interest).) Neal Chase, the current president of both SIBC and BPUPC, filed and signed these trademark applications, which stated among other things, that the BPUPC and SIBC are "legal successors" to Mason Remey. (*See, e.g.,* NSA Hr'g Ex. 115 at 7 (statement made on the BPUPC's behalf indicating that the BPUPC has used the term "Baha'i" continuously through its "legal predecessors," which include Mason Remey), NSA Hr'g Ex. 110 at 5 (statement made on the SIBC's behalf setting forth a "chain" of conveyances from Baha'u'allah through various others, including Mason Remey and Mr. Chase).) As the NSA sees it, these statements constitute "binding admissions" on the privity issue. (R. 133-1, NSA Br. at 8.) The Court disagrees.

The cited statements are not binding judicial admissions (that would foreclose consideration of the issue), but, at best, are only evidentiary admissions (that a court may weigh according to its judgment). *See Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996) (explaining the difference between the two types of admissions and indicating that a district

court judge may properly give "no weight" to evidentiary admissions).  Indeed, "a statement made in one lawsuit cannot be a judicial admission in another" – "[i]t can be *evidence* in the other lawsuit, but no more."  *Kohler v. Leslie Hindman, Inc*., 80 F.3d 1181, 1185 (7th Cir. 1996) (further noting that admissions in pleadings or in an answer to a request for admissions may constitute a binding judicial admission in the same lawsuit) (emphasis original); *Enquip, Inc. v. Smith-McDonald Corp*., 655 F.2d 115, 118 (7th Cir. 1981) ("It is well established in this circuit and elsewhere that such matter from one proceeding is indeed admissible and cognizable as an admission in another. . . . [W]hile such evidence was admissible it was not a judicial admission, and thus not binding or conclusive." (internal citation)); *see also McCaskill v. SCI Mgmt. Corp*., 298 F.3d 677, 682 (7th Cir. 2002) (a statement of legal opinion does not constitute a binding judicial admission) (Rovner, J., concurring).  Because the cited admissions occurred outside the current proceedings they do not bind the SIBC or BPUPC, and, accordingly, the Court is free to weigh those statements within the context of all the evidence.

After considering the full record in this case, the Court finds that SIBC and the BPUPC are not in privity with the NSA-UHG, notwithstanding the evidentiary admissions cited in the NSA's papers.  Foremost, the admissions are of low probative value here because the statements do not directly relate to whether Dr. Jensen was a successor-in-interest to the NSA-UHG, the bound party, but only to Mason Remey.  (*See, e.g.,* NSA Hr'g Ex. 115 at 7; NSA Hr'g Ex. 110 at 5.)  And other evidence in the record overwhelmingly demonstrates that Dr. Jensen was not affiliated with the NSA-UHG when the injunction issued, but rather that he had demonstrably disassociated himself from that group years prior.  *See also Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995) ("ordinary evidentiary admissions [ ] may be controverted or

explained by the party"). As a result, the facts regarding Dr. Jensen (and the entities he created) are on all fours with the facts in *Alemite*, which means that the NSA's motion fails as to both the SIBC and the BPUPC.

## CONCLUSION

For the above reasons, the Court finds that the Alleged Contemnors are not in privity with the NSA-UHG and, in turn, that they are not in contempt of the injunction.

Dated: April 23, 2008                        ENTERED:

_____
AMY J. ST. EVE
United States District Court Judge